ELSA LYON, Respondent, *v.* THE STARR PIANO COMPANY, Appellant.

First Department, July 2, 1920.

Contracts — agreement to assist in production of phonograph records by singing — breach — failure of plaintiff to continue performance on ground that time was insufficient in which to complete contract — submission to jury of question on which plaintiff introduced no evidence.

The plaintiff entered into a contract with the defendant whereby she agreed to assist for one year and personally serve the defendant " in the production of phonograph records by singing " and to sing twelve numbers and to repeat each number " until rendition is faultlessly recorded and a record satisfactory to the company and fit for its purpose is produced." Several recordings were had but only two records were satisfactory, and the defendant being unwilling to make any more recordings with orchestration till the plaintiff had made a test with piano accompaniment so wrote the plaintiff about one week before the expiration of the contract, and then suggested that the plaintiff was at liberty to select her own accompanist. The plaintiff did not reply to that letter nor did she take any action thereon. In an action on the contract, *held,* that the plaintiff violated her obligations under the contract in failing to take any action pursuant to the defendant's letter.

The fact that the time remaining in which the contract could be performed was short did not justify the plaintiff in failing to make any further effort to perform on her part, since it was not for the plaintiff to determine whether there was sufficient time within which to perform, but she was bound to perform the contract in so far as she was called on to perform during the year.

The plaintiff was not at liberty to abandon the contract while there remained a week during which partial if not complete performance could be had and to recover as for a total breach of the contract in so far as the defendant had not performed.

As there was no evidence that the rejected records were not imperfect, the question whether or not the defendant acted arbitrarily and in bad faith in refusing to accept the plaintiff's recordings should not have been submitted to the jury.

SMITH J., dissents.

APPEAL by the defendant, The Starr Piano Company, from an order and determination of the Appellate Term of the Supreme Court, entered in the office of the clerk of the county of New York on the 24th day of December, 1919, affirming

First Department, July, 1920.    [Vol. 192.

a judgment of the City Court of the City of New York, entered in the office of the clerk of said court on the 28th day of June, 1919, and also affirming an order of said City Court, entered on the 26th day of June, 1919, denying the defendant's motion for a new trial made upon the minutes.

*Walter A. Mulvihill* of counsel [*White & Case,* attorneys], for the appellant.

*Manuel M. Voit* of counsel [*Harold L. Klein* with him on the brief], for the respondent.

LAUGHLIN, J.:

This is an action to recover a balance of $500 alleged to be due and owing from the defendant to the plaintiff under a contract in writing made by the parties at Richmond, Ind., on the 31st day of October, 1916, and to recover the sum of $300 royalties alleged to be due to plaintiff thereunder and a balance of $742.50 alleged to be due to her thereunder for necessary expenses. The agreement shows that the plaintiff resided at Newark, O., and that defendant was a corporation engaged in business at Richmond, Ind. The plaintiff thereby agreed to assist for one year from the date thereof and personally serve defendant " in the production of phonograph-records by singing " and to sing twelve numbers and to repeat each number " until a rendition is faultlessly recorded and a record satisfactory to the company and fit for its purpose is produced." It was provided that the twelve numbers selected were to be mutually satisfactory, " subject, however, to the needs and purposes of the company," and that all renditions, recordings, rerecordings, repetitions or tests thereof were to be made in the recording room of the company at a time or times appointed by the company, with reasonable notice and convenience to the plaintiff. It was further provided that during said period and for a year thereafter plaintiff should at any time after the acceptance by the company of any record so produced in like manner assist and serve in the production of a new and additional record of any one or more of the twelve numbers and that she should receive therefor as extra pay an amount equal to the installment or sum paid to her for the original record production. It was agreed that

the records so produced should be the property of the defendant and that it should be at liberty to publish or sell them. Plaintiff covenanted that she would not give her assistance or lend her name to any other person, firm or corporation in connection with or for the purpose of producing phonograph records, whether for compensation or otherwise, except as expressly provided in the agreement. She also agreed to furnish photographs of herself to the defendant to be used as it might deem necessary. She also agreed to be painstaking and diligent in her performance of the contract, to observe and abide by all reasonable regulations and methods adopted and pursued by the company in and about the carrying on of its said business and work, and in and about the equipment and maintenance of its place or places of business. Defendant thereby agreed, in consideration of the agreements on the part of the plaintiff and performance thereof, to engage her assistance and personal services for the period and purposes therein stated and to pay her therefor the sum of $600 in manner following, namely, for each number, upon the acceptance by the company of a record and upon the production of a record thereof declared by the company to be satisfactory, an installment of $50; and it agreed to pay her a royalty of two per cent of the retail selling price of each record sold by it, such royalty, however, to be based on only two-thirds of the retail selling price of " mated " records, which are records produced by the mating of records of the plaintiff with the records of another artist or kind, and it agreed to pay such royalties on sales quarter-annually. The defendant also agreed to pay plaintiff in addition thereto her necessary expenses when she was required to make recordings at a place other than her domicile. It was further provided that the defendant should be released from any obligation under the contract either to proceed with the use of her assistance and services or to make any payment to her either of salary or royalties whether accrued or not, in the event that she violated the contract within one year from the date thereof, or during other periods to which the contract might be extended and that the company should thereby be released and excused from all payments and obligations with respect to royalties whether accrued or not. The answer put in issue the material

First Department, July, 1920.                [Vol. 192.

allegations of the complaint and alleged that the plaintiff failed to render and reproduce a record of any number that was declared satisfactory by the defendant, with the exception of the two which were accepted and paid for, and that plaintiff within one year from the date of the contract violated and broke her agreement in that she failed to render any number and produce a record thereof declared to be satisfactory by the defendant, excepting the two for which she was paid, and that thereby the contract became terminated and the defendant became released from any liability to the plaintiff thereunder.

At the outbreak of the war plaintiff was singing abroad. She returned home in September, 1914, and remained there giving concerts and singing lessons until January 1, 1916, when she took a sublease of a studio apartment in Carnegie Hall and occupied it for living quarters and giving singing lessons. When home on her vacation in September, 1916, before the making of the contract, she first started to record for the defendant at its Richmond, Ind., plant. That was her first experience in that line of work, which was quite different from singing in a concert. She testified that it consists in standing on a platform and singing into a horn, thereby making what is known as a test wax record and that the control of the voice in so doing is most important to prevent "blasting." From the test wax, the song is reproduced, and the singer and musical director take a position to hear it in order to discover whether there is any flaw or blasting and mark on the musical score, what changes if any should be made; and, if necessary, it is then reproduced again, or a new test wax is made by having the selection sung again by the artist, and this is continued until a master wax is produced by having the song rendered from the test wax, supposed to be satisfactory, but the master wax cannot be tested by reproducing it, and, therefore, it cannot be known for certainty, until it is developed in permanent form for phonographic use by being electroplated at the factory in Indiana, which takes from two to three weeks, whether or not it is perfect; and that, it is fairly to be inferred from the evidence, not only takes considerable time but involves quite an outlay. She made six or eight recording tests at that time on September twentieth, twenty-first, twenty-second and twenty-seventh.

In so far as plaintiff rendered services to the defendant under the contract, they were rendered under the supervision and direction of one Raymond Mayer, who was its musical recording director. Two of the records produced as a result of the plaintiff's efforts in September, 1916, were accepted and paid for by the defendant. The first of such payments was made on or about November 21, 1916, after the making of the contract, and on that day plaintiff wrote defendant's representative requesting that the records of the numbers then catalogued be sent to her and expressed hope that the real records were a great improvement over the tests. On November 24, 1916, defendant wrote plaintiff at her Carnegie Hall address stating that it would ship her the finished records as requested and expressed the belief that they were an improvement over the tests; but stated that they were far from being just what defendant would have them and expressed the belief that it would be of mutual benefit to have them all rerecorded in New York, and stated that plaintiff was to be one of defendant's leading artists and that inasmuch as it intended to lay special stress on advertising her records, it was necessary that it should have *perfect* records of her recordings. The letter also stated that defendant's recording machine had been improved and assured her that it would endeavor to have the best accompanist that it could get for her, and requested that she advise as to whether or not this proposition was satisfactory. The record contains no answer to that letter. It appears that the latter part of December, 1916, defendant moved its phonograph business but not its factory to 56 West Forty-fourth street, New York city, and commenced business here the latter part of February, 1917. Plaintiff testified that defendant made no appointment for her under the contract until Mayer telephoned her shortly prior to April 17, 1917, making an appointment for that date. She says that that appointment was postponed by defendant until the nineteenth or twentieth and that she was then indisposed and telephoned requesting another postponement, which was granted, and an appointment was made for the end of April. In the meantime, an injunction was obtained by neighbors, on account of annoyance from the singing, enjoining defendant from carrying on its business and it notified plaintiff

thereof and stated that it expected to have the injunction removed shortly and requested her to hold herself in readiness to proceed. The defendant claimed that only one appointment was made before the injunction was issued and that it was for April sixth, and that plaintiff was unable to keep it. She testified that thereafter she had many interviews with Mayer over the telephone in which she expressed the desire to proceed under the contract inasmuch as she was endeavoring to sublet her apartment to save expenses and wished to return home for the summer, and that she went home on June first. She admitted that at her last interview with Mayer before leaving he told her to hold herself in readiness and that defendant expected soon to resume the work. On the twenty-ninth of May defendant wrote her that the injunction had been continued by the appellate court but that it had leased another place in New York city and that it was writing Mr. Mayer, who was absent and took her contract with him, with respect to the period remaining for the performance of the contract and stated that it was desirous of fulfilling the contract as nearly as it could and that it was writing Mayer to take this matter up with her " to work out this situation the very best we can." On the sixth of June Mayer wrote the plaintiff at Newark, O., referring to the delay in having her recordings made and the causes thereof and to the effect that, as defendant intended to feature her records, it was desirous of having them taken under favorable conditions and that it would be necessary to give considerable effort to the orchestration of the selections and to have plenty of time taken in the recording room to get the very best results. The letter stated that it was the desire of the defendant to perform its contract with her to the letter within the time specified, which was October thirty-first, and that all of her recordings " will have been recorded by this time," and drew her attention to the fact that the contract only called for twelve records to be made within the year and contained no provision with respect to the distribution thereof throughout the year and stated that defendant could not advertise her records until good records were taken and accepted, and that it expected to move that week, and that within a short time it would have its new quarters in operation and that then it would notify her so

that she might advise it just when it would be most convenient for her to record for defendant. To that she replied on the sixteenth of June, complaining that there had been time to finish several records and that she felt justified in becoming impatient, and that if defendant when ready to proceed would inclose sufficient money for her expenses, she would return that month for a short period as she preferred to make a few records and then make the rest in September, and stated that she would be very busy in October and, therefore, she wished to complete these records as soon as possible. Defendant replied on June twenty-seventh that as soon as its new place of business was in running order, it would notify her when it could have her make records. On July thirteenth defendant wrote requesting plaintiff to send a list of the songs which she would like to record, and stated that it would obtain copies and make selections and be ready when she came. Evidently not having received any answer to that letter, it wrote her again July eighteenth asking for a list of the songs she would like to record, and stated that it would then make selections and obtain the music and be in readiness and able " to get through a lot of work " when she came, but that its laboratory would not be in shape until about the middle of August and that it expected to have her do her work between the fifteenth of August and the fifteenth of September. On July nineteenth it wrote her acknowledging receipt of the list of songs she wished to record and stated that it had made selections therefrom and was considering having the choruses of two sung by the male quartet, which it thought would make the record especially attractive, and stating that as soon as it received word from her regarding the list selected by it which it inclosed for her to indicate the key in which she desired the pieces of music arranged, it would proceed to make arrangements regarding her trip to New York. The defendant evidently received a letter in reply on July twenty-sixth, but plaintiff did not return the selections, for on August second it acknowledged the receipt of such a letter and stated that it expected before then to have the selections with the keys in which they were to be sung marked, and that until it received them it could make no arrangements, and that it would take three or four days or more " for the arranger to

fix all these numbers up," and that owing to the heat it did not contemplate doing any recording then, but that it would be ready about the first of September " providing this music is fixed up by that time." On the twenty-ninth of August it wired plaintiff making an appointment for September fourth. Plaintiff came on to New York pursuant to the telegram, arriving on the fourth of September, and went to the defendant's laboratory and was told to return the next day, which she did, and on that day several recordings were made. She then sang into the horn six times, producing two records, and was requested to return about the tenth, which she did and made two records that day and was requested to return about the fourteenth when she made one record and was then informed by Mayer that defendant desired to have the records tested by sending them on to Richmond and she would have to wait a couple of weeks until they came back before recording further, but he fixed no date. Plaintiff testified that she was summoned to the defendant's laboratory on September twenty-first and that one Gennette played over the records and asked what she thought of them and she said they were good but the orchestration was too loud, and he said they were more of a band record than a vocal record and that he did not wish to go to further expense and preferred to close the contract, and that she refused and said " the contract would have to be paid for," and left. Later on she admitted that the interview was after the completed records had been returned and was probably some two weeks after the last recording. On the twenty-fifth of September defendant sent her a check for her expense account and stated that it did not deem it advisable to have her do any more work until the records came back and it could hear them, and that it would then advise her so that she might call and hear them. On or about the twenty-fourth of October plaintiff received a letter from defendant stating that it had tried out all of the records she had made and had decided to reject all with the exception of two with the quartet chorus, which it reserved the right to pass on later, and stating that it was unwilling to record any more of her selections with orchestration until she had made a test with only a piano accompaniment, and that if

she had any special pianist she would like to accompany her, whose charges were not greater than union scales for that work, it would be glad to have her use such " accompaniment " for the test recordings and that the test dates would be at the convenience of both parties. To this letter she made no reply and she took no action thereon and never called at defendant's laboratory thereafter.

According to the testimony of Mayer, Gennette was the secretary of the defendant but was not in New York at the time plaintiff claims to have had the interview with him. It does not appear, other than as it may be inferred from her testimony concerning the interview, what authority, if any, he had in the premises. Inasmuch as this is the only connection it is shown he had with the matter, it cannot be inferred that he was authorized to terminate the contract. The plaintiff was not performing her work under his supervision; and moreover she did not acquiesce in the termination of the contract by him but manifested a desire and willingness to perform and announced a determination to hold the defendant to the contract, and on September twenty-fifth, only four days later, she received defendant's letter showing that it regarded the contract as continuing. There was then a month and five days within which to complete performance.

I am of opinion that the plaintiff violated her obligations under the contract in failing to take any action pursuant to defendant's letter of October twenty-fourth. She contends that she was under no obligation to procure an accompanist and, therefore, was warranted in ignoring the letter. The defendant, however, by writing the letter, did not take the position that it was her duty to procure an accompanist. It merely, owing to the fact that most of the records were unsatisfactory, offered her an opportunity to select her own accompanist. The defendant in writing the letter remained well within its rights under the express terms of the contract. It had the right to make the appointment at any time down to the end of October. The letter contained no evidence of any intention on the part of the defendant to act arbitrarily in the matter, and plaintiff should have responded to it and have offered to comply therewith, or should have called at the laboratory and have accepted a pianist of defendant's

selection if she did not wish to produce one of her own selection. It is said, however, that sufficient time did not remain to enable her to perform the contract before the expiration of the year; but there is evidence tending to show that all necessary recordings for the remaining number of records could have been made within the time remaining, and in fact within three or four days. She gives it as her opinion that such recordings could not have been completed within that time; but it is manifest that *her part of the work* could have been so completed had she given attention to the letter of October twenty-fourth instead of electing to abandon further performance of the contract on her part on the theory that defendant had failed to perform. However, it was not for the plaintiff to determine whether there was sufficient time to perform. It was her duty to perform the contract in so far as she was called upon to perform during the year. If she had done so and time was inadequate to enable her to perform completely, doubtless she would have had a cause of action. But she was not at liberty thus to abandon the contract while there yet remained a week during which partial if not complete performance could be had and to recover as for a total breach of the contract in so far as defendant had not performed it. The case was left to the jury to determine whether the defendant acted arbitrarily and in bad faith in refusing to accept her recordings, and as to whether she was not warranted in ignoring the letter of October twenty-fourth on the ground of the insufficiency of the time remaining for performance. I am of opinion that there was no material issue of fact to be determined by the jury, for there was no evidence that the rejected records were not imperfect. It follows that the determination of the Appellate Term and the judgment of the City Court should be reversed, with costs, and the complaint dismissed, with costs, on defendant's motion at the close of the evidence, to the denial of which it excepted.

CLARKE, P. J., PAGE and MERRELL, JJ., concur; SMITH, J., dissents.

Determination and judgment reversed, with costs, and complaint dismissed, with costs.